UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

In re
**MARIE A. COLOKATHIS,**
    Debtor

Chapter 7
Case No. 08-15458-JNF

**CATHERINE BAUER, M.D.,**
    Plaintiff
v.

Adv. P. No. 08-01326

**MARIE COLOKATHIS,**
    Defendant

**MEMORANDUM**

**I. INTRODUCTION**

The matter before the court is the Complaint filed by Catherine Bauer ("Bauer" or the "Plaintiff") through which she seeks an exception to the discharge of a certain debt owed by Marie Colokathis ("Colokathis" or the "Debtor").[1] Prior to the commencement of the Debtor's bankruptcy case on July 25, 2008, Bauer sued the Debtor for money damages in the Massachusetts Trial Court, Concord District Court. The parties settled that suit by filing an Agreement for Judgment in favor of Bauer in the amount of $12,000.00 in damages. The Agreement for Judgment stemmed from the Debtor's conviction in the United States District Court for the District of New Hampshire for, among other things,

---

[1] The Court observes that, on the Cover Sheet to her Complaint, the Plaintiff indicated that she was filing the Complaint pursuant to section 523(a)(2), (a)(4) and (a)(6). The Complaint itself contained no reference to any particular subsection of §23.

1

wire fraud and aggravated identity theft. Both the civil and criminal actions were based on the Debtor's unauthorized use of Bauer's social security number and date of birth to fraudulently obtain credit and services.

The issue presented is whether Bauer sustained her burden of establishing that the amount of the Agreement for Judgment is excepted from discharge under 11 U.S.C. § 523(a). The Court conducted a trial on June 17, 2009 during which eight exhibits were introduced into evidence and two witnesses testified, namely Bauer and the Debtor.

Based upon the testimony, exhibits, and memoranda submitted by the parties, including the transcript of the sentencing hearing before the Honorable Steven J. McAuliffe, United States District Judge for the District of New Hampshire, and the Agreement for Judgment entered in the civil action between the parties in the Concord District Court, the Court now makes the following findings of fact and rulings of law pursuant to Fed. R. Bankr. P. 7052.

## II. FACTS

The material facts of the case necessary to resolve the issue are not in serious dispute. Rather, the inferences and conclusions of law to be drawn from the facts are at the center of this adversary proceeding.

Bauer became aware of fraudulent activity with respect to her name and identity in 1999 when several credit card companies contacted her about applications for credit which she did not prepare or submit to them. (Tr. 12). In 2002, Bauer also received a collection notice from Keyspan Energy, which reflected that she owed $900.00 for an account in her

2

name at an unknown address. (Tr. 12). In 2004, she discovered a number of accounts on her credit report which had been fraudulently opened in her name and which prevented her from refinancing her home. The fraudulent activity relating to the misuse of Bauer's name and social security number began when the Debtor's daughter, Kelly Marino, found Bauer's driver's license on the ground in a parking lot.

On November 8, 2004, Bauer's attorney submitted a written complaint to the Newburyport Police Department about the theft of Bauer's identity. (Plaintiff's Exhibit 5 "Affidavit in Support of Search Warrant" ¶2). On December 1, 2004, the investigating officer, Brian D. Brunault ("Brunault"), prepared an affidavit in support of a search warrant for the Debtor's residence. (Id.). In his affidavit, Brunault summarized his investigation, reporting that Bauer's Equifax file established that someone living at 11 Russell Terrace, Newburyport, Massachusetts was using her personal information to obtain credit and had successfully obtained two Discover credit cards with the Newburyport mailing address in Bauer's name. (Id. at ¶9). The credit cards were used for purchases in Massachusetts, New Hampshire and California. The officer further reported that Chase Card Services had denied an application submitted via the internet for a credit card in Bauer's name. (Id.). After investigation, the officer discovered that the individual living at 11 Russell Terrace was Colokathis. Colokathis was known to the officer from previous investigations involving larceny, larceny by check, credit card misuse, and conspiracy.[2] Indeed, he

---

[2] The chronology of the Debtor's criminal history in the Commonwealth of Massachusetts was introduced into evidence without objection. (Plaintiff's Exhibits 2 and 7). The Court notes that Colokathis was charged with multiple crimes between

3

obtained a photograph of Colokathis and subsequently obtained a surveillance video showing Colokathis using a credit card in Bauer's name at a liquor store. (Id. at ¶32-33).

On December 2, 2004, the Newburyport Police Department executed a search warrant it obtained for 11 Russell Terrace, the home which the Debtor and her daughter, Kelly Marino, shared. (Id.). The police seized multiple items, including mail and credit cards in Bauer's name and in the name of Brianna Onasis. (Plaintiff's Exhibit 5 "Narrative for Inspector Brian D. Brunault"). At booking, the Debtor admitted to being involved in identity theft. (Id.).

Following her arrest, the United States Attorney brought charges against Colokathis in the United States District Court for the District of New Hampshire (the "criminal action"). After a jury trial, she was found guilty of 1) Wire Fraud and Attempted Wire Fraud; Aiding and Abetting Wire Fraud, 2) Attempted Use and Use of Unauthorized Access Devices Affecting Interstate or Foreign Commerce; Aiding and Abetting Such Uses, 3) Conspiracy to Use Unauthorized Access Devices Affecting Interstate of [sic] Foreign

---

September 1997 and June 1999. The Assistant United States Attorney at the Debtor's sentencing hearing urged the court to view the Debtor's criminal history in imposing his sentence, noting "the peculiar custom south of - - our southern border of apparently treating criminal fraud like a quasi-civil matter where so long as you pay your restitution prior to the time of trial, you get either probation or you get a dismissal. And as the Court can see from the presentence [sic] report, it happened time after time after time after time." (Defendant's Exhibit 1 at 39). The Assistant United States Attorney added "this is one such case where this defendant's criminal history definitely does not adequately reflect the seriousness of her past criminal conduct . . . ." (Id.).

4

Commerce, and 4) Aggravated Identity Theft, see 18 U.S.C. §§ 2; 1028A(a)(1)(B) and (c)(4);[3] 1029(a)(2) and (b)(2); and 1343 (Plaintiff's Exhibit 6). Finding her incorrigible and noting her recidivism and the need to protect the public, Judge McAuliffe sentenced her to 36 months in federal prison and a term of supervised release for an additional term of three years. (Defendant's Exhibit 1 at 47-48, 63). She also was ordered to pay restitution to: 1) Discover Financial Services, 2) Keyspan Energy, 3) Citgo/Citi, 4) Spiegel, and 5) Capital One Bank. (Id.). In addition, the United States District Court ordered Colokathis to pay Bauer's attorney's fees, which she paid directly to the attorney. The restitution order did not provide for any direct payments to Bauer. (Defendant's Exhibit 1 at 63).[4]

In sentencing the Debtor, Judge McAuliffe imposed an immediate sentence, refusing to give Colokathis thirty days to report to the Bureau of Prisons. He stated the following:

> The probation officer is of the opinion that she [the Debtor] poses a risk of flight, and I agree with that. She has used successfully, I might add, for a number of years alter egos, false identification. She's very conversant in adopting other identities and getting along.
>
> I'm not willing to take that chance. . . .

(Defendant's Exhibit 1 at 64).

---

[3] According to the court in U.S. v. Stepanian, 570 F.3d. 51, 59 (1st Cir. 2009), "[t]he elements of aggravated identity theft under 18 U.S.C. § 1028A are: 1) knowing transfer, possession, or use, without lawful authority, of a means of identification of another person, 2) in relation to a felony violation enumerated in subsection (c) of § 18 U.S.C. § 1028A."

[4] The sole evidence introduced at trial as to why Bauer was not awarded restitution in the criminal action comes from a transcript of the sentencing hearing, in which Bauer's attorney inquired of the Court about Bauer's ability to obtain restitution for lost wages. The judge's response was "that's not compensable as a loss."

5

Bauer subsequently filed a complaint in the Massachusetts Trial Court, Concord District Court for damages, costs and attorney's fees, citing Mass. Gen. Laws ch. 266, § 37E[5] (the "civil action") (Plaintiff's Exhibit 1). In her complaint filed in the civil action, Bauer alleged that the Debtor was a convicted felon in the custody of the United States Bureau

---

[5] Section 37E provides in relevant part:

. . . (b) Whoever, with intent to defraud, poses as another person without the express authorization of that person and uses such person's personal identifying information to obtain or to attempt to obtain money, credit, goods, services, anything of value, any identification card or other evidence of such person's identity, or to harass another shall be guilty of identity fraud and shall be punished by a fine of not more than $5,000 or imprisonment in a house of correction for not more than two and one-half years, or by both such fine and imprisonment.

(c) Whoever, with intent to defraud, obtains personal identifying information about another person without the express authorization of such person, with the intent to pose as such person or who obtains personal identifying information about a person without the express authorization of such person in order to assist another to pose as such person in order to obtain money, credit, goods, services, anything of value, any identification card or other evidence of such person's identity, or to harass another shall be guilty of the crime of identity fraud and shall be punished by a fine of not more than $5,000 or imprisonment in a house of correction for not more than two and one-half years, or by both such fine and imprisonment.

(d) A person found guilty of violating any provisions of this section shall, in addition to any other punishment, be ordered to make restitution for financial loss sustained by a victim as a result of such violation. Financial loss may include any costs incurred by such victim in correcting the credit history of such victim or any costs incurred in connection with any civil or administrative proceeding to satisfy any debt or other obligation of such victim, including lost wages and attorney's fees. . . .

Mass. Gen. Laws ch. 266, § 37E.

of Prisons. She further alleged that after Colokathis stole her identity she incurred legal fees, lost time from her psychiatric practice, and sustained personal injuries by way of emotional distress "as a result of Defendant's negligent, wilful [sic] wanton and reckless and intentional conduct in stealing Plaintiff's identity." Before a trial on the merits, the parties entered into an Agreement for Judgment. (Plaintiff's Exhibit 3). Pursuant to the Agreement for Judgment, the Debtor agreed to pay Bauer $12,000.00, in monthly installments of $333.00 at a 12% rate of interest per year. Payments were to begin on June 15, 2008, or, in the event that the Debtor did not obtain employment, on July 15, 2008. (Plaintiff's Exhibit 3). The Debtor has made no payments to Bauer.

The Debtor filed a Chapter 13 petition on July 25, 2008. Bauer filed the Complaint now before the Court on November 7, 2008. Approximately three weeks later, Colokathis converted her Chapter 13 case to a case under Chapter 7, and, pursuant to Fed. R. Bankr. P. 1019(2), a new deadline was established for filing complaints under Fed. R. Bankr. P. 4007.

In her Complaint, Bauer alleged that the Concord District Court complaint was based upon the Debtor's "false pretenses, false representations and actual fraud in using Plaintiff's identity to obtain valuable goods and/or services;" that Defendant's liability under said suit was also based on Defendant's willful and malicious injury to Plaintiff by using Plaintiff's Social Security Number, date of birth, etc. in obtaining credit and running up debts in Plaintiff's name on Plaintiff's credit;" and that "Plaintiff believes and further alleges that Defendant's obligation to her is nondishargeable under FRBP [sic] 7001(6) on

7

other grounds."

## III. DISCUSSION

### A. Procedural Issues

Because Bauer filed the instant adversary proceeding against the Debtor while her case was a case under Chapter 13, this Court must consider the issues posed by the subsequent conversion of the Debtor's case to a case under Chapter 7. Section 1328(a) does not except from the Chapter 13 discharge debts of the kind set forth in 11 U.S.C. § 523(a)(6) "for willful and malicious injury by the debtor to another entity or to the property of another entity." Section 1328, however, does except from discharge debts of the kind set forth in section 523(a)(2) and (a)(4), as well as debts "for restitution, or damages, awarded in a civil action against the debtor as a result of willful or malicious injury by the debtor that caused personal injury to an individual or the death of an individual." *See* 11 U.S.C. § 1328(a)(2) and (a)(4). Although Bauer did not specifically cite 11 U.S.C. § 523(a)(2)(A), (a)(4) or (a)(6), the Court shall treat her Complaint as amended to conform to the evidence to state causes of action under sections 523(a)(2)(a), (a)(4) and (a)(6). *See* Douglas v. Kosinski (In re Kosinski), No. 06-1400, 2009 WL 261538 at *9 (Bankr. D. Mass. Feb. 4, 2009). Moreover, because Colokathis did not object to Bauer's failure to file another complaint under 11 U.S.C. § 523(a) after the conversion of her case to Chapter 7 or raise any issue as to the timeliness of the Complaint, particularly as to section 523(a)(6), the Court shall deem the Complaint to be timely filed in the Chapter 7 case. *Cf.* Kontrick v. Ryan, 540 U.S. 443 (2004). Colokathis forfeited her right to raise any issues as to timeliness of Bauer's

8

Complaint, which was not refiled after the conversion of the case to a case under Chapter 7.

### B. Section 523(a)(6)

A debt incurred through "willful and malicious injury by the debtor to another entity or to the property of another entity" is excepted from discharge under 11 U.S.C. §523(a)(6). The Court finds that Bauer's claim against the Debtor arose as a direct result of the Debtor's theft of Bauer's identity and use of that identity to obtain credit and services. The Debtor was convicted of multiple crimes in the United States District Court for the District of New Hampshire arising out of the theft of Bauer's personal information. She thereafter entered into an Agreement for Judgment in the civil action in which Bauer alleged that she suffered emotional distress as a result of Colokathis' "negligent, wilful [sic] wanton and reckless and intentional conduct." (Plaintiff's Exhibit 4). Notably, the underlying complaint filed in the Concord District Court is predicated upon and makes reference to the Debtor's conviction for multiple felonies involving identity theft in the United States District Court for the District of New Hampshire.[6]

---

[6] By way of background, Congress criminalized identity theft in 18 U.S.C. § 1028, which prohibits certain knowing uses of another's identification information. According to one commentator, "it is useful to think of identity theft as a type of fraud with two distinct categories: new account fraud and account takeover." Chris Jay Hoofnagle, "Identity Theft: Making the Known Unknowns Known," 21 Harvard J. L. & Tech. 97 (Fall 2007 ). According to the author of the article,

> In new account fraud, an impostor opens lines of credit using the personal information of another. Such lines of credit may include new credit card accounts, mortgages, or utilities. These types of credit require that the impostor have the victim's Social Security number ("SSN"). Generally,

9

In Archer v. Warner, 538 U.S. 314 (2003), the United States Supreme Court considered the question of whether a debt arising under a settlement agreement resulting from a state court action for fraud could be found nondischargeable under 11 U.S.C. § 523(a)(2)(A). The bankruptcy court had found that the debt was dischargeable, and both the District Court and the United States Court of Appeals for the Fourth Circuit affirmed

---

    new account fraud is a serious problem for consumers, because the fraudulent accounts may appear on the victim's credit history, making it more difficult to obtain new credit. The impostor's use of the accounts may also act as a barrier to employment.

    An important subset of new account fraud is synthetic identity theft. While common new account fraud involves use of the victim's true name, in the case of synthetic identity theft, an impostor uses the victim's SSN with a fake name, thus creating a new, "synthetic" identity. Alternatively, an impostor can create an identity from scratch, using entirely fabricated information. A synthetic identity — sometimes supplemented with artfully created credit histories — can then be used to apply for credit. While it may sound improbable, this approach to opening new lines of credit is generally successful for two reasons. First, some lenders will give accounts to individuals with no credit history. A synthetic identity simply has a "thinner" credit file — a characteristic consistent with a legitimate new customer who is just entering the credit market. Second, the use of a real SSN may allow impostors to satisfy a lender's security measures; there is mounting evidence that credit issuers use the SSN for both identification and authentication, that is, to locate the applicant's credit file and to prove that the credit file belongs to the applicant.

Id. at 101-02. Additionally, "individuals whose identifying information is used to construct synthetic identities may not suffer direct financial losses as a result of the crime. However, victims of synthetic identity theft may suffer non-monetary losses For instance, a debt collector attempting to recover funds associated with the synthetic identity's account may, in searching for the debtor, attribute the account to the real owner of the SSN. Such contacts from debt collectors may cause reputational harm and emotional distress, in addition to wasting the victim's time and resources." Id. at 102-03. It is clear that the Debtor used Bauer's information in both of the foregoing ways.

the bankruptcy court decision. The Supreme Court, recognizing a split among the circuits on the issue of whether debts arising out of the settlement of fraud claims are nondischargeable, granted certiorari. The Court determined that a settlement agreement or agreement for judgment does not convert a debt arising out of fraud to a dischargeable debt arising out of breach of contract. 538 U.S. at 322. The Court, relying upon its earlier decision in Brown v. Felsen, 442 U.S. 127 (1979), in which it held that res judicata did not prevent a bankruptcy court from reviewing the judgment and record in a prior state-court proceeding and looking beyond them when considering the dischargeability of a debt, id. at 138-39, determined that the existence of a stipulation "did not bar the [creditors] from showing that the settlement debt arose out of . . . fraud." Archer v. Warner, 538 U.S. at 323. As explained by the United States Bankruptcy Appellate Panel for the First Circuit, reducing a fraud claim to a settlement does not definitively change the nature of the debt for dischargeability purposes. Burrell-Richardson v. Ma. Bd. of Higher Ed. (In re Burrell-Richardson), 356 B.R. 797, 802 (B.A.P. 1st Cir. 2006) (citing Archer, 538 U.S. at 320). "In other words, creditors are free to look beyond a settlement to determine the character of the debt." 356 B.R. at 802.

Since the decision in Warner, numerous courts have applied the Supreme Court's holding to other categories of nondischargeability actions under section 523(a). *See* Giaimo v. DeTrano (In re DeTrano), 326 F.3d 319, 322 (2nd Cir. 2003)("if the tort claims against [the debtor] would have created a nondischargeable debt [. . .] had those claims been litigated to judgment in [the creditor's] favor, then it is no defense for [the debtor] to state that he

11

has replaced that possible liability with a dischargeable contractual obligation through the settlement agreement").

Because the Supreme Court in <u>Archer v. Warner</u> indicated that the facts of the case from which the agreement arose will determine whether the elements of section 523 are satisfied, this Court need only look to the underlying civil action in order to determine whether Bauer's claim is nondischargeable under section 523(a)(6). 538 U.S. at 320. Therefore, the question before the Court is whether the underlying complaint and the allegations contained in it satisfy section 523(a)(6)'s requirement that the debt be for "willful and malicious injury" to Bauer.

In <u>Kawaauhau v. Geiger</u>, 523 U.S. 57 (1998), the Supreme Court analyzed the elements of the exception to discharge under section 523(a)(6). The Court determined that "[t]he word 'willful' in § 523(a)(6) modifies the word 'injury,' indicating that exception to discharge requires proof of a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." 523 U.S. at 61. As a result of the Supreme Court's decision, actions of the debtor which simply cause injury, but which are not deliberately undertaken, are not excepted from discharge. Because the Court found that the defendant's actions did not rise to the level of willful injury, the Court did not reach the question of what the term "malicious" added to the analysis. <u>Id.</u>

The United States Court of Appeals for the First Circuit in <u>Printy v. Dean Witter Reynolds, Inc.</u>,110 F.3d 853 (1st Cir. 1997), held that the element of malice in section 523(a)(6) requires that the creditor show that the injury was caused without justification or

excuse. Id. at 859. The Printy formulation is followed by courts in this circuit. *See, e.g.*, Caci v. Brink (In re Brink), 333 B.R. 560, 567 (Bankr. D. Mass. 2005); Gomes v. Lemieux (In re Limieux), 306 B.R. 433, 440 (Bankr. D. Mass. 2004); McAlister v. Slosberg (In re Slosberg), 225 B.R. 9, 21 (Bankr. D. Maine 1998).

Construing Geiger and Printy together, this Court concludes that, for an exception to discharge under 11 U.S.C. § 523(a)(6) to apply, the creditor has the burden of showing by a preponderance of the evidence, *see* Grogan v. Garner, 498 U.S. 279 (1991), that 1) the creditor suffered injury; 2) the debtor intended to cause the injury or that there was substantial certainty that the injury would occur; and 3) the debtor had no justification or excuse for the action resulting in injury. This is consistent with the Slosberg court's view that although "the terms [willful and malicious] might share elements, i.e., they both require that the act itself be intentional, they must have independent significance. In re Geiger should not be read to collapse the two elements into one." Slosberg, 225 B.R. at 19-20 (citations omitted).

First, Bauer has the burden of showing that the theft of her personal information by the Debtor caused her to suffer injury. Geiger, 523 U.S. 57. Bauer testified that she lived, and continues to live, in fear of the moment when "the next shoe would drop". (Tr. 14). She testified that, as a professional psychiatrist, she would categorize her symptoms as post-traumatic stress syndrome. (Tr. 16) Bauer further testified that fraudulent activity appearing on her credit report has made it difficult for her to refinance her mortgage and that it continues to affect her creditworthiness. (Tr. 17). The Court finds that the Debtor's

13

theft injured Bauer personally because she has suffered emotional distress, and it injured her credit score and credit reports.

Injury alone is not enough to make the debt nondischargeable under section 523(a)(6), however. Bauer also had the burden of showing that the Debtor either subjectively intended to cause the injury or that, objectively, she knew that her actions would be "substantially certain to cause injury." Slosberg, 225 B.R. at 18. While the Debtor testified that she did not mean to harm Bauer, her testimony is incredible in view of her admitted criminal background and the findings of District Court Judge McAuliffe at the sentencing hearing. The Debtor opened and used credit card and service accounts in Bauer's name for years, and she used Bauer's social security number to obtain credit under the name of Brianna Onassis. She fraudulently established these accounts using a name and social security number from a driver's license Bauer lost. The Court discredits any suggestion that because the Debtor did not know Bauer personally she did not know or intend her actions to harm Bauer. Her actions could have no other consequence and cannot be attributed to negligence as was the case in Geiger. There was a substantial certainty that opening accounts and using fraudulently obtained credit cards with stolen information, coupled with charging large numbers of transactions to those cards, would result in harm, including a demand on Bauer to pay debts she never incurred and damage to Bauer's creditworthiness. Bauer's creditworthiness is intangible property, which was harmed as a result of the Debtor's actions.

With regard to damages to the person or property of an individual unknown to the

14

debtor, the decision in Van Vuurren v. Berrien (In re Berrien), 368 B.R. 85, 2007 WL 1701679 (B.A.P. 10th Cir. June 13, 2007), aff'd, 280 Fed.Appx. 762, 2008 WL 2275928 (10th Cir. 2008), is instructive. In that case, the debtor fraudulently accused an 18 year-old girl of a hit and run collision in a parking lot. 2007 WL 1701679 at *2. After watching a young woman drive through the parking lot, the debtor fabricated a story that the young woman struck his wife and fled the scene. Prior to bankruptcy, the parents of the driver sued the debtor for, among other things, conspiracy to defraud. The debtor filed for Chapter 7 relief on the eve of a state court trial. The driver and her parents filed a complaint in the debtor's bankruptcy case seeking exception to discharge for the claims arising out of the debtor's fraudulent conduct under section 523(a)(6). The bankruptcy court awarded the plaintiffs $96,000 in nondischargeable damages.

On appeal to the United States Bankruptcy Appellate Panel for the Tenth Circuit, the debtor argued that since he directed all of his conduct exclusively at the driver, the bankruptcy court could not properly have determined that any resulting injury to the parents was "willful and malicious." Id. at *3. The Panel considered and rejected the debtor's argument:

> Metaphorically, Debtor argues that he has no accountability to [the driver] because, despite having tossed a hand grenade at her, he missed and she suffered no injury. Moreover, Debtor is not accountable to the [parents] because, although they were injured by the grenade, he did not intend to hit them when he threw it.

Id. The Panel upheld the bankruptcy court's award of money damages, finding that the

15

debt was properly excepted from discharge. The court stated: "[t]he fact that Debtor neither knew nor cared who ultimately became the "victim" of his fraud does not insulate his conduct from applicability of § 523(a)(6)." Id. at *4. The Panel also reiterated the view expressed by the Tenth Circuit that, although an intentional tortfeasor is liable for the consequences of his acts, "it does not follow that everything that happens to the victim following the commission of the tort was intended by the tortfeasor." Id. at n. 16. The Panel added, however, that "§ 523(a)(6) may be satisfied by debtor's belief that the conduct is substantially certain to cause the injury." Id. (Citing Panalis v. Moore (In re Moore), 357 F.3d 1125, 1129 (10th Cir. 2004)). In excepting the debt from discharge under section 523(a)(6), the Panel concluded that the debtor knew his false accusations were substantially certain to result in financial harm. 2007 WL 1701679 at *3 n. 16. Similarly, in this adversary proceeding, the Debtor knew that opening and using credit cards and service accounts would cause financial harm to the individual whose personal information was used. Indeed, the Debtor had been found guilty of misuse of credit cards in Massachusetts and was aware of the resulting impact on the finances, credit history and reputation of her victims. Therefore, the first prong of the Geiger test, proof of deliberate or intentional injury, is satisfied.

The final issue under section 523(a)(6) that must be addressed is whether the Debtor had just cause or excuse to perpetrate the identity theft. The lack of just cause or excuse makes the act malicious. *See* Slosberg, 225 B.R. at 22. *See also* Printy, 110 F.3d at 859 (defining malice as "wrongful and without just cause or excuse, even in the absence of

personal hatred, spite or ill will."). This standard for malice, pronounced by the Supreme Court in Tinker v. Colwell, 193 U.S. 473 (1904), was left undisturbed by the *Geiger* analysis of dischargeability. Therefore, a debt may be dischargeable when it was incurred through willful conduct, even when injury was reasonably certain to occur, if there was duress or some other element which made the act justifiable. *See, e.g.* Federal Deposit Ins. Corp. v. Cerar (In re Cerar), 97 B.R. 447, 452 (C.D. Ill. 1989)(discussing whether debtor was under duress when forging notes to avoid foreclosure).

The Court finds that the identity theft, and the Debtor's conviction of numerous federal crimes, underlying the Agreement for Judgment and the state court complaint, were committed without justification or excuse. There is no element of duress or other justification in the record which would clear a path for the Debtor to steal another's identity. *See* Slosberg, 225 B.R. at 22. Accordingly, the Court finds that the debt arose from the Debtor's willful and malicious injury to the Plaintiff, and the debt resulting from these acts is nondischargeable under 11 U.S.C. §523(a)(6).

C. Sections 523(a)(2)(A) and (a)(4)

Alternatively, the Court concludes that the debt owed Bauer is nondischargeable under section 523(a)(2)(A) and (a)(4). In Hancock v. Caliri (In re Caliri), 335 B.R. 2 (Bankr. D. Mass. 2005), this Court stated:

> As the courts recognized in Adamo v. Scheller (In re Scheller), 265 B.R. 39, 53 (Bankr. S.D.N.Y. 2001), and Great American Ins. Co. v. Graziano (In re Graziano), 35 B.R. 589, 594 (Bankr. E.D.N.Y. 1983), what constitutes larceny for purposes of § 523(a)(4) is a question of federal law. "Larceny is the (1)

17

wrongful taking of (2) property (3) of another (4) without the owner's consent (5) with intent to convert the property." Scheller, 265 B.R. at 53; Graziano, 35 B.R. at 594.

335 B.R. at 12. *See also* Evergreen Marine Corp. v. Six Consignments of Frozen Scallops, 4 F.3d 90, 95 (1st Cir. 1993).[7] The Debtor's theft of Bauer's identity, coupled with her conviction of multiple felonies, satisfies the elements of larceny under both federal and state law.

Alternatively, the Debtor's conduct would satisfy the definition of actual fraud under 11 U.S.C. § 523(a)(2)(A) adopted by the United States Court of Appeals for the Seventh Circuit in McClellan v. Cantrell, 217 F.3d 890 (7th Cir. 2000). In that case, the Seventh Circuit expanded the scope of section 523(a)(2)(A)'s exception to discharge beyond the common law tort of misrepresentation. It observed that fraud is not limited to misrepresentations and misleading omissions, 217 F.3d at 893, adding "'[f]raud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning,

---

[7] Under Massachusetts law, a plaintiff must establish the following elements to prevail on a conversion claim: "(1) the defendant intentionally and wrongfully exercised control or dominion over the personal property; (2) the plaintiff had an ownership or possessory interest in the property at the time of the alleged conversion; (3) the plaintiff was damaged by the defendant's conduct; and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of right, the plaintiff's demand for its return was refused." 4 F.3d at 95.

dissembling, and any unfair way by which another is cheated.'" Id. (quoting Stapleton v. Holt, 207 Okla. 443, 250 P.2d 451, 453-54 (Okla.1952)). The United States Court of Appeals for the First Circuit in McCrory v. Spigel (In re Spigel), 260 F.3d 27 (1st Cir. 2001), did not adopt the McClellan approach, but it did not reject it either. It stated: "McClellan is consistent with our existing precedent in that it also requires a direct link between the alleged fraud and the creation of the debt." 217 F.3d at 32 n. 7. That link is satisfied in this case. Were the First Circuit to adopt McClellan, this Court concludes that the Debtor's conduct would fall neatly within its ambit.

## IV. CONCLUSION

In view of the amount of the Agreement for Judgment for $12,000.00 which accrues at the rate of 12% per year, which runs from the date of judgment until the Debtor's petition date, the Court shall enter a judgment in favor of Bauer and against the Debtor, and shall require Bauer to submit a proposed form of judgment for the amount of $12,000 plus interest at the federal judgment rate from the date of the filing of the adversary complaint to the date of the judgment. Interest at the federal rate shall continue to accrue on the judgment until satisfied.

By the Court,

*[signature]*

Dated: September 21, 2009
cc: John R. Lamont, Esq., Marie Colokathis

Joan N. Feeney
United States Bankruptcy Judge

19